CONSUMERS' COTTON-OIL CO. v. ASHBURN.

(Circuit Court of Appeals, Fifth Circuit. May 25, 1897.)

No. 565.

1. FEDERAL COURTS—EXCEPTIONS TO CHARGE—STATE STATUTES.

The act of congress of 1872, providing that the practice in federal courts shall conform "as near as may be" to the practice in the state courts, does not apply to the practice of requiring exceptions to the charge to be made while the jury is at the bar, and before it retires; and a state statute dispensing with this requirement will not be followed.

2. SALES—WAIVER OF RIGHT OF ACTION FOR BREACH.

The buyer waives his right of action for the seller's breach of contract by entering into a new contract with him for the purchase of a part of the same goods.

In Error to the Circuit Court of the United States for the Northern District of Texas.

Two actions heard together, the one by Consumers' Cotton-Oil Company against E. J. Ashburn for the price of goods sold, and

the other by E. J. Ashburn against the company for damages for breach of contract. · Verdict for plaintiff in the latter action, and judgment in his favor for balance due after deducting the amount sued for by the company, and admitted by him to be due. The Consumers' Cotton-Oil Company brings this writ of error.

Geo. Clark and D. C. Bolinger, for plaintiff in error.

A. C. Prendergast and Wm. Evans, for defendant in error.

Before PARDEE · and McCORMICK, Circuit Judges, and NEWMAN, District Judge.

NEWMAN, District Judge. It appears from the record in this case that in September, 1893, W. I. Yopp, as the representative of the Consumers' Cotton-Oil Company, entered into negotiations with E. J. Ashburn, at Waco, Tex., for the sale by said company to Ashburn of certain cotton-seed meal and hulls. The conversation and negotiations finally resulted in what is claimed by Ashburn to have been a contract for the sale by the said company to Ashburn of 2,600 tons of hulls and 600 tons of meal; the hulls at $2.75 per ton, and the meal at $17.25· per ton.· A memorandum was made at the request of Yopp by R. B. Dickey, superintendent of the Consumers' Cotton-Oil Company Mill, at Waco, of the transaction. While Ashburn claims that what was done was to be binding if he accepted it within 24 hours, which he did, the company claims that when Ashburn accepted it, and so notified Dickey, Yopp was to be notified by wire at Houston, and he was to have opportunity to confer with his company at its headquarters, in Chicago, before the trade became binding. The result of the matter was, however, that the company declined the contract,—declined to carry it out, according to Ashburn's version, and declined to make it, according to the company's version. After some further negotiations and correspondence, on the 30th day of October, 1893, there resulted a contract which will be shown by the following letter, written by Yopp from Houston, Tex., to Dickey, at Waco, and subsequently signed by Ashburn:

"Houston, Texas, October 30th, 1893.

"Mr. R. B. Dickey, Mngr., Waco, Texas.

"Ashburn Contract.

"Dear Sir: Referring to contract with E. J. Ashburn for hulls and meal, I sent him telegram dated Little Rock, Sept. 29th, reading: 'Offer thousand tons hulls at $4.00, and 300 tons meal at $20.00, equal quantities daily for four months, beginning Oct. 15th, but will not furnish ground. This subject immediate acceptance by wire.' Ashburn's answer on same date as follows: 'Your telegram received, pricing meal and hulls. I will accept your proposition.' You will therefore deliver hulls and meal as above outlined, and collect for same on the 1st of each month, beginning with the 1st of November, as originally understood between Mr. Ashburn and myself. To avoid any misunderstanding, you better submit this letter to Mr. Ashburn for his signature, and advise me whether he signs same or not.

"Yours truly, W. I. Yopp, Genl. Mngr. Mills.
"E. J. Ashburn."

This contract having been made for 1,000 tons of hulls, at $4, and 300 tons of meal, at $20, the company proceeded to deliver both the hulls and the meal in accordance with the contract. At the conclu-

sion of the contract Ashburn was indebted to the company in the sum of $2,395.77, which he failed to pay, and for which suit was brought by the company against Ashburn in the circuit court of the United States, on March 29, 1894.    Prior to the time that this suit by the company against Ashburn came on for trial, suit had been brought by Ashburn against the company, in the state court, for $10,000, damages for breach of what he alleged was a contract for the sale to him of the 2,600 tons of hulls and 600 tons of meal, in September, 1893.    This latter case was removed on application of the defendant into the circuit court of the United States, and by consent and by order of the court both cases were tried together.    When the cases came on for trial, Ashburn admitted in open court that he was indebted to the company in the sum of $2,395.77, which, with interest to that date, amounted to $2,818.20, and the trial proceeded on his suit for damages, and resulted in a verdict for Ashburn against the company for $4,900, from which was deducted the amount of the company's recovery against Ashburn, leaving a net recovery by Ashburn against the company for $2,081.80, for which judgment was entered.

For a proper disposition of this case here, two questions only need be considered.    It is claimed that the court erred in instructing the jury that the measure of damages was the difference between the price at which the Consumers' Company agreed to sell the hulls and meal to Ashburn, and the price Ashburn subsequently had to pay, the contention being that the correct measure of damages under the law applicable to the case was the difference between the price stipulated in the contract sued on by Ashburn, and the market value of the cotton-seed hulls and meal at the place of delivery, on the several days when the several deliveries should have been made under the contract.    While we think the contention is sound, and that the court erred in this instruction, it cannot be considered here, for the reason that no proper exception was taken and reserved by counsel for the company at the time.    It is claimed that under the statutes of Texas (Rev. St. Tex. art. 1318) which provide that exceptions may be assigned to any part of the charge of the court, without having the same noted at the time, that this court will consider exceptions made here, although not properly saved in the court below.    The contention is that the rule and practice of the state court are applicable in this respect in the federal court.    We do not so understand it.

It is well settled that the act of congress of 1872, providing that the practice, etc., in the federal courts shall conform "as near as may be" to the practice, etc., in the state courts, does not apply to the established practice relating to the manner of submitting cases to the jury by the judge of the federal court; nor does it apply to the well-understood practice of requiring exceptions to the charge to be made while the jury is at the bar, and before it retires.

See the following extract from St. Clair v. U. S., 154 U. S. 134, 153, 14 Sup. Ct. 1002, 1010, on this point, and the former decisions of the supreme court cited therein:

"What is necessary to be done in a circuit court, even in civil cases, in order that its action upon any particular question or matter may be reviewed or refused in this court, depends upon the acts of congress and the rules of

practice which this court recognizes as essential in the administration of justice. Such is the result of our decision. Rev. St. § 914; Act June 1, 1872, c. 255, § 5 (17 Stat. 197); Nudd v. Burrows, 91 U. S. 426; Railroad Co. v. Horst, 93 U. S. 291; In re Chateaugay Ore & Iron Co., 128 U. S. 544, 553, 9 Sup. Ct. 150; Pacific Co. v. Denton, 146 U. S. 202, 208, 13 Sup. Ct. 44; Luxton v. Bridge Co., 147 U. S. 337, 338, 13 Sup. Ct. 356; Lincoln v. Power, 151 U. S. 436, 442, 14 Sup. Ct. 387. See, also, Logan v. U. S., 144 U. S. 263, 303, 12 Sup. Ct. 617."

But the further consideration of this alleged error as to the charge of the court on the measure of damages is really unnecessary, because of the opinion we entertain of another question in the case.

The court was requested by counsel for the company to instruct the jury as follows:

"The jury in this case are instructed, as matter of law, that where a contract has been made between two persons, and at a subsequent period another contract, having reference to the same subject-matter, but changing the relations of the first contract, is entered into, the last contract controls or rescinds the first, though there be no such effect expressed between the parties. The jury are therefore instructed that if they believe from the evidence that an absolute contract for the sale and delivery of 2,600 tons of cotton-seed hulls, at $2.75 per ton, and 600 of cotton-seed meal, at $17.25 per ton, was made and entered into between the Consumers' Cotton-Oil Company and E. J. Ashburn, on or about the 12th or 13th day of September, 1893, and thereafter, before any part of said contract was executed, and before the time for its execution had arrived, another and different contract was entered into between said parties, and whereby the Consumers' Cotton-Oil Company agreed to sell to Ashburn only 1,000 tons of cotton-seed hulls, at $4.00 per ton, and 300 tons of cotton-seed meal, at $20.00 per ton, then you are instructed that in that event, if Ashburn agreed to the modification of the original contract, no right of recovery upon the original contract remained in existence, but such new contract is tantamount to a waiver on the part of Ashburn of the original contract, and in that event the jury will find for the Consumers' Cotton-Oil Company."

In giving this charge as requested to the jury, the court accompanied it with the following:

"The request which the counsel for the company has asked me to read I believe is good law, and I give it to you. It is in regard to the waiver of the first contract, if you find it was made by the making of the second. You will determine whether or not, at the time of making the second contract, it was the intention of the parties making the contract to waive or modify the first contract, and whether it was the intention of the parties to make a new contract, separate and independent of the first, and without any relation thereto."

It will be seen that, according to this qualification of the presiding judge, the jury were to determine the effect of the second contract on the first contract by the intention of the parties at the time the second contract was made. The question was, and is here: What was the legal effect of the second contract on the first? Did the second supersede, abrogate, and take the place of the first contract, as matter of law? If the legal effect of the second contract, referring to and covering the same general subject-matter as the first contract, was that it took the place of the first contract, then the intention of the parties is not material. We think the effect of the second contract was, as contended for by the counsel for the company, that it superseded the first entirely. It is very doubtful as to whether what transpired in the first instance amounted to a contract, but even

assuming the strongest view of this for the defendant in error, assuming that the first negotiations resulted in a contract, when he entered into the second contract he lost all rights he might have claimed under the first. If he desired to insist upon his rights under the first contract, he should have stood by it, insisting on its performance, and not have made a subsequent arrangement.

In the case of U. S. v. Lamont, 155 U. S. 309, 15 Sup. Ct. 99, a similar question was presented, and the view entertained by that court will be shown by the following extract from the opinion:

"But, even if the writ of mandamus could be so perverted as to make it serve the purposes of an ordinary suit, the relator is in no position to avail himself of such relief. He entered of his own accord into the second contract, and has acted under it, and has taken advantages which resulted from his action under it, having received the compensation which was to be paid under its terms. Having done all this, he is estopped from denying the validity of the contract. Oregonian Ry. Co. v. Oregon Ry., etc., Co., 10 Sawy. 464, 22 Fed. 245. Nor does the fact that, in making his second contract, the relator protested that he had rights under the first, better his position. If he had any such rights, and desired to maintain them, he should have abstained from putting himself in a position where he voluntarily took advantage of the second opportunity to secure the work. A party cannot avoid the legal consequences of his acts by protesting at the time he does them that he does not intend to subject himself to such consequences. In the case of Bank of U. S. v. Bank of Washington, 6 Pet. 8, certain payments had been made to the first bank upon a decision of the court below, with notice that the payor intended to take the case to the supreme court of the United States, and would expect payee, the Bank of the United States, to refund the money if that court should reverse the decision of the court below, and hold that it was not due. The court said: 'No notice whatever could change the rights of the parties so as to make the Bank of the United States responsible to refund the money.' The whole case of this relator is covered by Gilbert v. U. S., 8 Wall. 358, in which this court, through Mr. Justice Miller, said: 'If the claimants had any objection to the provisions of the contract they signed, they should have refused to make it. Having made it and executed it, their mouths are closed against any denial that it superseded all previous arrangements.'"

Other authorities might be cited, but it is unnecessary. We think the plaintiff in error was entitled to the instruction requested, without any qualification. For this reason, the judgment of the court below must be reversed, with instructions to grant a new trial, and for further proceedings in accordance with this opinion.