J. J. WILSON, Appellee, v. ASA GIBBS, Appellant.

BROKERS: Compensation—Express Contract—Evidence and Conclusions. A broker who bases his right to recover commission on an express contract providing a stated sum per acre, must establish such express contract *by showing the language used by the parties*, not his (the broker's) legal conclusion drawn from such language. So held where the broker, having obtained the owner's price, assumed that, if he sold the land at an advance of $5 per acre, such $5 would be his commission.

BROKERS: Compensation—Action to Recover—Evidence—Sufficiency. Evidence reviewed, and held insufficient to show such *performance* by a broker of his alleged contract for commission (assuming the same to be established) as to justify recovery.

**BROKERS:** Compensation—Mutual Substitution of Contract—Effect. A broker forfeits his right to base a claim for commission on a certain specified contract negotiated by him, when, after so negotiating it, he, without making any claim to a commission thereunder, acquiesces in the substitution of a *new* agreement between the parties.

**BROKERS:** Compensation — Sale — Producing Purchaser — Essentials. An agent, to be entitled to recover commissions upon an alleged sale, or for the production of an alleged purchaser, must show what authority was given him by the principal, what terms he was authorized to make, and that he made a sale on the very terms authorized, or produced a purchaser ready, willing and able to purchase upon the precise terms authorized. Where the agent had *forgotten* part of the terms, *held*, he was not entitled to recover.

*Appeal from Hancock District Court.—C. H. KELLEY,*
Judge.

MONDAY, DECEMBER 18, 1916.

REHEARING DENIED FRIDAY, JUNE 22, 1917.

ACTION at law upon an alleged contract by which the defendant undertook to pay the plaintiff a stipulated compensation for the production of a purchaser ready, willing and able to buy the defendant's land.—*Reversed and remanded.*

*Blythe, Markley, Rule & Smith,* and *John Hamill,* for appellant.

*Seneff, Bliss & Witwer,* for appellee.

WEAVER, J.—The plaintiff alleges that he is a real estate agent, and that defendant listed with him a farm of 280 acres for sale at $115 per acre *net;* that, on the following day, plaintiff found a purchaser for the property ready, willing and able to buy the same at $120 per acre on the terms prescribed by defendant, but defendant refused to make or complete the sale, and he therefore asks

judgment for the recovery of his commission at the rate of $5 per acre. By an amendment to the petition, it is alleged that said agreement sued upon was partly in writing and partly oral, and that the written portion is embodied in a letter written to plaintiff by one Arnold, saying:

"I want to tell you that one 80 of the Gibbs farm has been sold today at $95 per acre; another 80 will probably be sold within a few days at the same figure; this leaves 280 acres with all the improvements. The price will be changed on this 280 to $115 per acre. If you think of doing anything with this, I believe it will not be long till the whole farm is sold."

The answer of defendant denies the petition. He further denies having any dealing with the plaintiff, except as follows: That plaintiff, with one Stauffer, another real estate dealer, and one Guth, came to defendant's home, exhibiting the letter written by Arnold. Plaintiff or Stauffer made inquiry concerning the land, and defendant told them his price was $120 per acre. Thereupon, Stauffer said he would take the land at $120 per acre. Defendant knew Stauffer to be a man of no means, and declined to consider the offer. Just at this time, according to his story, another party of real estate agents, led by one Kluckhorn, drove up, and Kluckhorn asked for and was given an option until the following Monday morning to make the purchase at that price. Learning of this, Stauffer then asked for an option to buy at $120 per acre if Kluckhorn did not take the land. Plaintiff, Stauffeur and Guth then drove away, but soon returned, and then for the first time informed defendant that Guth, instead of Stauffer, was the man who wanted to make the purchase, and Guth said that if Kluckhorn did not take the property, he would himself buy it at $120 per acre; but before the interview was concluded, Guth raised his offer for the land to $125, if the sale to Kluckhorn did not materialize, and, upon the

strength of this offer, the defendant agreed that, in the event Kluckhorn did not exercise his option to purchase, he would sell to Guth at the last mentioned price, and would pay plaintiff a commission thereon. Later, on the same or the following day, and before the expiration of the Kluckhorn option, Guth notified defendant in writing that he would not buy the land unless he could get it at $115 per acre, and informed him that he need not delay another sale because of the option given him at the larger price. Defendant further pleads that plaintiff, Stauffer and Guth were all present when the agreement was made between himself and Guth on the basis of $125 per acre, and acquiesced therein, plaintiff making no claim that he had earned or was entitled to any commission on any other basis or consideration than the completion of the proposed sale to Guth at $125 per acre.

The issues thus joined were tried to a jury, which returned a verdict for plaintiff for the full amount of his claim. From the judgment on this verdict, defendant appeals.

I. At the conclusion of the testimony,

1. BROKERS: compensation: express contract: evidence and conclusions.

defendant moved the court for an instruction to the jury that plaintiff had failed to produce evidence of the making of the contract sued upon. This, with other requested instructions, tantamount to a peremptory direction for a verdict in defendant's favor because of insufficiency of evidence, was overruled. In his motion for new trial, defendant again raised the objection that the verdict is without sufficient support in the evidence. The issues joined by the petition and answer leave no room for a recovery by plaintiff upon an implied agreement or upon *quantum meruit*. To recover at all, he must prove an express contract to pay him the commission for which he demands a recovery. In this, we are of the opinion that plaintiff distinctly failed. In

the first place, the letter of Arnold, pleaded as part of the contract, and spoken of in argument as constituting the plaintiff an agent for the defendant, has no such apparent meaning or effect. Plaintiff, in his testimony, says no more than that Arnold had issued a circular (not in evidence), listing or advertising something over 400 acres of defendant's lands for sale, and had handed or sent him a copy of the circular, and that thereafter he had received this letter. There is nothing in the letter expressly or impliedly, authorizing plaintiff to act as agent of either the defendant or Arnold, and no suggestion of commissions in any amount. Coming next to the interview between plaintiff and defendant, in which mention was made of this letter, we find it quite barren of evidence of the alleged contract sued upon. The contract or agreement was made, if at all, on the morning when the plaintiff, Stauffer and Guth went to the defendant's farm. On arriving at the place, plaintiff says he left the automobile and went into the yard, where he found the defendant, and there ensued the conversation on which he relies. Neither Guth nor Stauffer was present, and for the facts as to their conversation, we have to look only to the testimony of the plaintiff and defendant. The defendant denies having then made any agreement with the plaintiff authorizing him to sell the land, but says he told him the selling price was $120 per acre, and that nothing whatever was said about commissions. The plaintiff says he showed defendant Arnold's letter, and asked, "Can I go on and sell the farm?" and that defendant said he could. To the question, "What did you say to him about the price?" plaintiff answered, "Well, I said $115; there I told him—he said I could have all over that I could get." It will be observed that the answer is in the nature of the conclusion of the witness, rather than an attempt to state the exact language of the defendant from which it is drawn, and furthermore does not state the con-

tract as it is pleaded. That it was a mere conclusion or inference, and that as such it was without real foundation, is demonstrated when the witness was led to repeat, as best he could, the very conversation had. And this is his version of it. He says:

"I told him Mr. Arnold wanted me to sell the farm. He said, 'All right; you can go ahead and sell it.' And I said, 'I have a buyer for it;' and he said, 'At $115?' and I said, 'Yes.' He said 'All right.' He said, 'The best thing to do is to sell it;' then I went out. I went out and told him the place was for sale; showed him the letter and told him that Mr. Arnold had asked me to sell the place. Q. Was the conversation as you swore to it at the last term? A. Yes. He told me to go ahead and sell it at $115 an acre. *I understood from that he had authorized me to sell the land at $115 an acre.* Then I immediately went to see Mr. Guth. Mr. Stauffer was with me. Q. Now when you went out to see Mr. Guth, you told Mr. Guth that Mr. Arnold's price was $120 an acre, didn't you? A. That was my price. Q. You told Mr. Guth that the price of the land was $120 an acre, didn't you? A. I did so. Q. And you told him also that Arnold or Gibbs had raised the price? A. I don't remember if I did, I am sure. I might have said that Gibbs had raised the price to $120 an acre; I don't remember now. Q. Your understanding was that you were to sell this land for $120 an acre, and that you could take the difference for your commissions? A. I was to get all over $115. Q. Were you to get all the money that Gibbs received for that land over $115 an acre? A. I was pricing it at $120 and he was pricing it at $115. I was to get the $5 an acre. *I assumed that I would get the $5 an acre for my commission.* Q. But you and Mr. Gibbs didn't talk anything about that? A. *Well, I was giving him what he asked.* Q. You were going to take all you could get above that? A. I was getting $5."

In another place, he says that, because Gibbs said his price was $115, "for that reason I thought that anything I could get above that should be mine." In short, plaintiff proceeds upon the theory that, having ascertained defendant's price for the land, he was at liberty to speculate upon it by quoting a higher price to his alleged customer and retaining for himself all the margin of profit. That such theory of the law, though perhaps quite largely entertained by agents, is erroneous, no lawyer will question. It is not necessary to charge plaintiff with bad faith in such assumption. It is sufficient that his own statement of the facts does not in law justify his conclusion as to the effect of the agreement to which he testifies. It is true also that, if he were suing on a *quantum meruit* for the value of his services, if any, his testimony would probably be sufficient to sustain a finding that he was authorized to sell or find a purchaser for the land, but this, we have seen, is not enough under the issues, and to recover, he must, as we have already said, establish the agreement as alleged, and this is to be done by showing the language used by the parties at the time, and not simply the plaintiff's legal conclusion drawn therefrom.

II. Even if the correctness of the foregoing be thought open to doubt, and if we

2. BROKERS: compensation: action to recover: evidence: sufficiency.

should assume that plaintiff made a case sufficient to support a finding that a contract such as he alleges was entered into with the defendant, we are still of the opinion that, as a matter of law, the evidence of performance by the plaintiff is not sufficient to sustain a verdict in his favor. Plaintiff's story is that, after his talk with defendant, he went back to Guth, told him that the price was $120 per acre, and that the latter finally said to him (plaintiff) that he would take the land. This he says he reported to defendant when, to use the language of the witness:

"He wanted to make his find-out; he would see; said he would think it over."

Whatever may have been the reason for this hesitation, whether it was to satisfy himself as to the financial ability of the proposed purchaser or for any other reason sound or unsound, it is clear that the seller and buyer were not yet brought together. It was during the interim caused by this hesitation on defendant's part that, according to plaintiff, the other party of real estate agents appeared on the scene, and, before anything further passed between the parties to this action, defendant gave to Kluckhorn an option until the next Monday morning to buy the land at $120 per acre. Of this act on the part of defendant, plaintiff and Guth appear to have made no complaint, except a remark by one of them that they had not been treated right; but an understanding was finally reached that, if Kluckhorn did not take the land on Monday, plaintiff or his customer could have it at the same figure—$120 per acre. There is dispute over this matter, but such, in substance, is the statement of plaintiff. Plaintiff, Stauffer and Guth then drove away, but within an hour came back, and reopened the matter with defendant, and finally Guth offered $125 an acre for the land, provided Kluckhorn did not take it on Monday. This, according to plaintiff, was agreed upon, and that, in case such sale was made, defendant was to pay a commission of $5 per acre. Later, on the same day, Guth notified the defendant in writing of the withdrawal of his offer, and refused to take the land at any price in excess of $115 per acre. Guth as a witness says that he had no personal talk or negotiation with defendant until he came back with plaintiff the second time, and the entire evidence strongly tends to show that this was the first time that defendant was given to understand that Guth, instead of Stauffer, was the proposed buyer. Guth's version of his own connection with the transaction is as follows:

"I was a witness at the former trial. Know J. J. Stauffer and J. J. Wilson. I went out to Gibbs' farm with Stauffer and Wilson on the 29th of May. When I went out there, I didn't say anything to speak of. I left it to Stauffer and Wilson, the first time. The second time, I told him it was me that wanted the place. That was after I came back. Then I told him it was me that wanted the place, and Gibbs said Kluckhorn had an option till Monday. Before that time, J. J. Stauffer had been talking with Mr. Gibbs about buying it. I did not ask Gibbs his price the first time I was there. Q. No, but the second time you were there, what did you say? A. Yes, I knew the price was $120, and we offered him $125 the second time. Wilson and I did not talk it over before I offered Gibbs $125 an acre. Before we left Gibbs the first time, I heard from Wilson and Stauffer that Gibbs had given an option to Kluckhorn; then I started away and went back, and then I told Gibbs that I was the man that wanted to buy it. He told me there was an option on it. Q. Now did Mr. Wilson at any time say to you, Mr. Guth, that you would have to make a payment of $2,400, first payment? Cash payment? A. No, sir. Q. Did you have $2,400 to make a cash payment? A. No, sir. Q. Was any kind of a sale ever made known to you, except after this $125 contract was made? A. No. Q. Was there anything said at all about what was to be done or how long a time was to be on the balance, or how much interest there was to be, or anything about the abstracts, or anything connected with the general terms of sale, until after you went back there the second time and talked about the $125? A. No. Q. And when did you ask Mr. Gibbs as to the terms? A. That was the next day. I authorized Mr. Nisson to write exhibit 'E,' and I mailed it the 31st of May.

"Exhibit 'E' offered in evidence. No objections. Reads as follows:

"Farmers Savings Bank, Meservey, Iowa, May 29th, 1912. Mr. F. A. Arnold, Cashier, Klemme, Iowa. Dear sir: Mr. August Guth is just in here and requested me to write you that he would not take the Gibbs farm, unless he could get it at $115, as he first offered you, and you are not to delay another sale for him, because the deal was to be kept open till Monday. Yours truly, A. J. Nisson, Cashier.

"After I came back, there was talk that I would take it at $125 an acre, in case Kluckhorn didn't buy it. Nothing by Gibbs about a commission.

"Cross-examined: I testified at the privious trial that the reason that I wrote the letter was because I thought Gibbs was trying to play me up against other buyers. At the former trial the question was asked: Q. What did you say as to the matter of terms, whether they were satisfactory? A. I don't know as we talked about terms; maybe, but I have forgotten. Q. That is the truth, isn't it? A. Yes, sir. I testified I don't remember what was said at that time about terms, but I know I said I would take the land at $120 an acre. I wasn't going to get it for $120. I told Wilson I would take it at $120. I testified I would take it at $120 an acre, and whatever terms Mr. Wilson made were satisfactory. Don't recall what Mr. Wilson told me about terms. Q. Then there is another question: 'When Mr. Wilson told you that you could buy the place at $120 an acre, state whether or not you were ready, willing and able to buy this farm at that time on the price and terms as given you? And your answer was, 'Yes, sir, I was.' A. I testified so. I then testified that Mr. Kluckhorn arrived. Q. You don't remember the details of the terms, but whatever they were, they were satisfactory to you, and you said you would take them? A. Yes, sir. Q. I believe that is all. Oh, just a minute. Mr. Guth, you were able to raise $2,400? A. Yes. When Mr. Gibbs came back he did

not say he would try to spoil the other deal.   He said he got
an option until Monday, and I will have to see Kluckhorn;
said he would try to get it for him.   There had been talk of
Stauffer and I buying it together, but before I left the place,
Kluckhorn came.   I told Stauffer I would like to take
the place by myself.

"Redirect examination: The first time I was there, I
didn't talk to Mr. Gibbs at all.   The second time, or be-
fore I went away, I understood from either Wilson or
Stauffer that he had given an option to somebody else.   Up
to the time that I made the offer of $125 no terms were
talked over or agreed upon at all.

"Recross-examination:  I don't remember of talking
over terms with anybody.   There was something said about
five per cent, but that was the next day, when I was there
with Gibbs alone.   I saw Gibbs when I was there the first
time, but didn't talk to him.   Mr. Wilson was doing the
talking with Gibbs."

"Redirect examination: The result of Mr. Wilson's talk
was that he informed me that Mr. Kluckhorn had an option
until Monday.   Later, I went back and made the contract
at $125."

Plaintiff's story, as developed on cross-examination,
concerning the interview with defendant and the arrange-
ment to sell to Guth at $125 per acre, contingent upon the
failure of Kluckhorn to take advantage of his option, is
here quoted from the record.   After stating his recollection
of what had occurred up to the arrival of the Kluckhorn
party, he proceeds:

"I don't remember anything further that was said be-
tween Mr. Gibbs or between Guth and Gibbs, until after
the other car came in.   Mr. Gibbs came back from the car
and said he would give those people an option until Mon-
day at $120 an acre, and if they didn't take it, we could
have the farm.   Q.  You could have the farm at what?

A. Yes, that is, Guth could have it at $120. Q. If these people didn't take it on Monday or by Monday, you could have it at $120? A. Yes, we could have the farm. Q. Well, then, what was said after that? A. Well, Mr. Guth told him, told Mr. Gibbs, that he was not treated right on the farm, and we talked there awhile. I don't remember all that happened, but we went away. Q. You went away with the understanding that Mr. Guth could have the land on Monday for $120, provided Mr. Kluckhorn did not buy it in the meantime, didn't you? A. No, he told Mr. Guth he could have the place, providing Mr. Kluckhorn's man would not take it; that he gave them an option until Monday. Q. Then when you went away, you supposed that it would be a sale to Guth, provided Kluckhorn's man didn't take it by Monday, didn't you? A. I didn't know whether they would take it or not; I couldn't tell; I didn't know whether Guth or Kluckhorn's man would take it. I couldn't tell you. Q. Well, if Kluckhorn's man didn't take it, Guth was to take it on Monday? A. No, he made him that proposition that he would take it, if the other fellow didn't. We went away for about two miles and then came back. At the former trial, I testified that I had not made any deal the first time, and so we came back to buy it at $125 an acre. Q. You testified to that? A. Yes, sir. Q. You had not made a deal the first time, and so came back to buy it at $125 an acre? A. That is right. At the former trial, I testified as follows: 'Q. And at that time you made a deal? A. Well, he said he would take. We got in the car and was going to town and he said he would take it. Q. And left with the understanding that Guth was to pay $125 an acre, and he was to pay a commission to you? A. Yes, sir. Q. That was the understanding? A. Yes, that is right. Q. You left there finally with the understanding that this land was sold to Guth at $125 an acre, provided Kluckhorn didn't buy it by Monday,

didn't you, Mr. Wilson? A. Why, we went to town, and
Guth offered him $125 an acre. It was a calculation of set-
tlement. Now I am going to tell you just where we went.
We went over there in front of the restaurant. Met Mr.
Arnold. Mr. Gibbs, he told his troubles to his son-in-law
in regard to the deal, and they said that they would let him
have this farm, and they would go down and see this
man and queer the deal to let our man have it.
The offer he made him last was $125, as I told you; he
said he would let him have the place and go down and
spoil the deal with this man at Belmond, and let
him have the farm; that is just what he said. Guth said he
would take it at $125. I did not know before I commenced
this suit that Guth refused to take it. Q. You supposed
that he was going to take it at $125 an acre, did you? A.
Yes. Q. When you commenced the suit, did you think
that Guth had bought the land at $125 an acre? A. Well
I thought that it was his; that he had bought the farm. Q.
You thought that he had bought the farm at $125 an acre,
didn't you? A. Yes.' At the former trial I testified: 'Q.
It was your understanding at the time this was commenced,
Mr. Wilson, that you had been instrumental in making a
sale of this land to Mr. Guth at $125 an acre, and that Mr.
Gibbs had promised you a commission of $5 an acre if that
sale went through, wasn't it? A. Well, yes, sir.' Just as
I said before, if he got $150, it wouldn't make any differ-
ence to me. Q. Well, the testimony at the former trial
was as follows: 'Q. You say that you went back the sec-
ond time, and Mr. Guth then agreed to take the land at $125
an acre, and that Gibbs then told you that he would pay
you $5 an acre commission? A. Yes. Q. That is, in case
Mr. Guth would take it at $125 an acre? A. Yes. Q. And
it was based on that that you brought this suit, wasn't it?
A. Yes. Q. That was your testimony, wasn't it? A. Proba-
bly. Q. And that is the way you understand it now, isn't

it? A. No, I think not. I meant that on $115, Mr. Mark-
ley; I might have overspoken there, in that way, but a man
with common sense would know that I would not say that it
was based on that. I testified on the former trial that, when
I went to talk to Mr. Gibbs, after riding out there to the
farm, I showed him the letter, and the price, $115 an acre,
and he said that was all right. I said, 'Do you care if I go
ahead and sell the farm?' and he said, 'No,' to go ahead and
sell it; and I said to him that I had a buyer in the car,
and one of them might buy it. I don't remember that I
testified on the former trial that Guth said he wanted to
look at the premises. Then we talked it over and Mr. Guth
said he would take the place. I don't think Mr. Guth
asked Mr. Gibbs the price of the farm, because I told him
the price before I went over there. I don't remember that
I testified at the former trial that Guth asked the price, and
Mr. Gibbs told him. Q. $120 an acre, that first conversa-
tion after you had your talk with Mr. Gibbs and got Guth
and went over there, didn't Mr. Guth ask Mr. Gibbs the price
and Mr. Gibbs tell him the price? A. I guess maybe he
did. Q. Yes, you remember it now, do you? A. No, I
don't remember all of it. I don't know what price Mr.
Gibbs gave him. I gave the price, I know that. I did tes-
tify at the former trial that Mr. Guth asked the price and
Mr. Gibbs told him. I don't remember whether Mr. Gibbs'
price to Mr. Guth was $115 or $120 an acre. I don't re-
member what it was. $2,400 was to be paid in cash; no time
was set when the contract would be made. It is the usual
thing just as soon as they agree. I knew the land. It was
Mr. Gibbs' homestead. I testified as follows at the former
trial: 'Q. So after he told you that he had given the oth-
er fellows an option on it, you knew then that you couldn't
get it unless the other fellows couldn't get it or didn't take
it, didn't you? A. I knew he said he had given the other
fellows an option on it, but I figured that I had earned my

commission; I was trying to have my commission. Q. That is, on Monday, if the other fellows didn't take it? A. That is right.' I also testified: 'Q. You figured you ought to have a commission of whatever was paid over $115 an acre? A. Yes, sir, because that is what he said he wanted, and for that reason I thought that anything that I could get above that should be mine. In other words, I take it that was the net price to the owner. I didn't ask Mr. Gibbs $10 an acre commission. He said he wanted $115 an acre for the land, as the letter said, and told me to go ahead and sell it, and as I had a customer there for $120 an acre, I figured that I had earned that $5 an acre. *The reason I thought I was entitled to the $5 an acre was that he said I could sell it for $115 an acre.* I later asked Mr. Gibbs for a commission; and J. J. Stauffer was along.'

"Redirect examination: I also testified at the former trial that, when I commenced suit, I still thought that my customer would take the land at $125 an acre, but it didn't make any difference to me, but I was figuring my suit as the difference between $115 and $120 an acre. I also testified that I figured that I sold the place fair, or had a customer for it at $120 an acre, and if $115 an acre was his price, I was entitled to my commission of $5 an acre. I also testified that before he came back and offered $125 an acre, there had been talk of a commission. Guth did not offer $125 an acre when we were there at first, but after we had gone away a couple of miles, he said, 'I am going back; the place suits me, and I will give $125 an acre for it;' then we drove back. He went to Klemme that same evening to dig up the $125 and Gibbs went with him. He brought Gibbs back home. He says, 'August, if I can fix the deal with those fellows down there, and clear the deal,' he says, 'I will let you have the place and I will give $5 an acre commission.' That is what was said exactly. Q. Now with reference to your $5 an acre, it is immaterial, I

believe you said, as to what he sold the farm for; you wanted your $5 an acre commission. You were willing to let Gibbs make a better deal, if he could, if he would pay you $5? A. Yes, sir."

We think the record as a whole is without any substantial ground on which a finding may be justified that Guth was presented to the defendant as a proposed purchaser of the land until after Kluckhorn left the premises and plaintiff and his party returned to the farm a second time; but, should we be disposed to say there is some evidence tending to sustain the plaintiff in this respect, it seems to us very clear that there was, by common and mutual consent of all the parties, including the alleged agent or agents, an abandonment of such proposed sale and a substitution therefor of another arrangement, by which Guth would buy the land on the following Monday at $125 per acre, if Kluckhorn did not sooner take it, and, in event that such sale to Guth was consummated, defendant would pay an agent's commission. He concedes that he did promise a commission if this sale went through, but denies that the amount of such commission was agreed upon or mentioned. Plaintiff, as we have seen, also claims he was promised a commission on this sale, but says it was to be at the rate of $5 per acre, and that it was upon the supposition that the sale to Guth had in fact been consummated that he brought this action. The only reasonable conclusion from this statement on his part is that he brought this suit upon the theory that defendant owed him a commission under the last mentioned agreement, for producing a customer to whom a sale had been actually made at $125 per acre, and later, having learned that the customer had refused to complete the purchase and the sale had proved abortive, he shifted his ground and seeks recovery upon an alleged first contract, which, according to his own showing, had been mutually

abandoned; and, if this be true, no recovery can be had in this action.

III.  Bearing upon the same feature of the case, defendant asked the court to in-. struct the jury as follows:

3. BROKERS: compensation: mutual substitution of contract: effect.

"If you find from the evidence that, on the trip to defendant's farm, August Guth made an oral contract with the defendant to purchase the land at $125 an acre, provided Kluckhorn did not take it by the Monday following, and that the plaintiff J. J. Wilson was present with Guth and the defendant, and knew of said offer, and acquiesced therein, and made no claim for compensations at that time, then the plaintiffs cannot recover in this action."

This request was refused, and the proposition stated therein was not contained or embodied in any part of the court's charge.  For the reasons stated in the preceding paragraph of this opinion, the instruction as asked, or some other of like tenor and effect, should have been given to the jury.  The ruling was erroneous.  It was entirely competent for the parties to modify a contract theretofore made between them, or to mutually abandon an agreement and terminate its binding obligation upon them, or to substitute a new and different agreement for an earlier one.  The original consideration, the change in the relations of the parties in respect to the subject-matter of the agreement, the substitution or change of one obligation for another, is ordinarily sufficient consideration to render such transaction valid and binding.  3 Elliott on Contracts, Sec. 1865; 3 Page on Contracts, Sec. 1340; *Cleveland City R. Co. v. City of Cleveland,* 94 Fed. 385; *Consumers' Cotton Oil Co. v. Ashburn,* 81 Fed. 331; *Hall v. Wright,* Ann. Cas. 1912 A, 1255, and note.

IV.   Plaintiff, according to his version

4. BROKERS: com-
pensation: sale:
producing pur-
chaser: essen-
tials.

of the alleged contract made at the first in-
terview with defendant, says he was author-
ized to sell the land at $115 per acre on a
payment of $1,000 down, and the remainder on certain de-
ferred installments, the particulars of which he professes
to have forgotten.   He admits that he reported the price to
Guth at $120 per acre, and demanded a cash payment of
$2,400, and $4,000 on March 1st following; and as to the
other terms, while he cannot remember what they were, he
still is sure that he reported them correctly to Guth and
they were satisfactory to him.   Question is raised by appeal
whether, even on plaintiff's theory of the contract, he can
be permitted to recover when he confessedly misquoted to
the buyer the price at which he was authorized to sell, de-
manded a greater initial payment than was required by de-
fendant, and cannot now tell what the other terms were on
which he was authorized to sell.   On this point, it should
also be said that Guth forgets entirely whether, before their
second call on defendant, plaintiff had reported to him the
terms of defendant's proposed sale, and, if such report was
made, he does not know what they were; but in answer to
plaintiff's counsel, he says it is possible plaintiff did so
report, and, if so, he answered that the terms were satis-
factory.   The clear tendency, however, of his story as a
whole, is to the effect that he heard nothing about the terms
at that first interview.   Nor is there any evidence that plain-
tiff advised the defendant of his act in swelling the demand
for down payment from $1,000 to $2,400, in order that his
alleged commission should be included therein, or that such
act was in any manner approved or ratified.   It is, of
course, elementary that, for an agent to be entitled to re-
cover commissions upon an alleged sale, or for the produc-
tion of an alleged purchaser, he must show what authority
was given him by the principal and what terms he was au-

thorized to make, and that he made a sale on the very terms authorized, or produced a purchaser ready, willing and able to purchase upon the precise terms of the authority so vested in him. May such agent recover when he says:

"I do not know or do not remember the terms authorized by my principal, or the terms which I was expected to exact from my customer, but feel sure that, whatever the terms were, I repeated them correctly to the customer and otained his consent thereto?"

As we look at it, this is neither more nor less than a confession of the plaintiff's inability to produce evidence of one of the facts essential to sustain his right of action. This defect in his case is aggravated rather than remedied by the production of the customer who says:

"Wilson did not tell me I would have to make a cash payment of $2,400. Nothing was said at all about what was to be done, or how long the time was to be on the balance, or how much interest there was to be, or anything about abstracts or anything connected with the general terms of sale until after I went back there the second time and talked about the $125."

This failure of proof of performance, even upon plaintiff's own theory of the contract, is sufficient to forbid a recovery upon the record before us.

The further question whether an agent having an agreement with the owner to sell his land or produce a buyer therefor at a named net price is thereby authorized to demand of the buyer any such greater price as in his discretion he may place thereon, and have or retain to himself the excess so realized over the net figure mentioned in his contract of employment, we think it unnecessary now to decide. If there be, as counsel seem to admit there is authority for saying, difference between an agent's authority to sell at a "net price," and authority to sell and have as his compensation all which may be realized over and above a stated

price, it is to be noted that plaintiff in this case expressly pleads and founds his claim for a recovery upon an alleged contract of the first description—that is, a contract authorizing him to sell at a net price; and it is upon the contract pleaded that he must recover, if at all. See *Jordan v. Hill*, 172 Iowa 414; *Allen v. Klopton*, (Tex.) 135 S. W. 242; *Louva v. Worden*, (N. D.) 152 N. W. 689; *Matheney, Beasley & Koon v. Godin*, (Ga.) 61 S. E. 703.

V. Other points made in argument are controlled by the conclusions hereinbefore announced, or are of a character not likely to arise on another trial, and we will not extend this opinion for their discussion.

The judgment appealed from must be reversed, and the cause remanded to the district court for a new trial.—*Reversed and remanded.*

DEEMER, EVANS and PRESTON, JJ., concur.